NOT FOR PUBLICATION

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| PJR CONSTRUCTION OF NEW JERSEY, INC.,<br><br>Plaintiff,<br><br>v.<br><br>VALLEY FORGE INSURANCE COMPANY & NATIONAL FIRE INSURANCE COMPANY OF HARTFORD,<br><br>Defendants. | Civil Action No. 17-4219 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court upon Defendants Valley Forge Insurance Company ("Valley Forge") and National Fire Insurance Company of Hartford's ("National Fire") (collectively, "Defendants") Motion for Summary Judgment. (ECF No. 17.) Plaintiff PJR Construction of New Jersey, Inc. ("Plaintiff" or "PJR") opposed (ECF No. 20), and Defendants replied (ECF No. 21). The Court has carefully considered the parties' submissions and decides the motion without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth herein, Defendants' Motion for Summary Judgment is granted.

**I. BACKGROUND**[1]

The instant dispute arises from Defendants' denial of coverage under a commercial general liability coverage policy Defendants issued to Plaintiff (the "Policy"). (*See* Compl. ¶¶ 3-11, ECF

---

[1] The Court's recitation of facts draws from Defendants' Rule 56.1 statement (Defs.' Statement of Material Facts Not in Dispute ("DSUMF"), ECF No. 17-2) and Plaintiff's Rule 56.1 statement (Pl.'s Counterstatement of Material Facts ("PJRSUMF"), ECF No. 20-3). In accordance with Local Civil Rule 56.1, the parties responded to their opponents' Rule 56.1 statements. (*See* Pl.'s

No. 1.) Pursuant to the Policy,[2] Plaintiff sought coverage for a dispute between Plaintiff and Cambridge Real Property, LLC (the "PJR-Cambridge Dispute"). (DSUMF ¶ 37.)

On December 7, 2011, Plaintiff and Cambridge Real Property, LLC ("Cambridge") executed an agreement for Plaintiff to construct a "26,250 square foot swim club[] and 3,150 square foot pavilion building" in Aberdeen Township, New Jersey (the "Project"). (DSUMF ¶ 1; Ex. 1 at 9, ECF No. 17-4 (the "Agreement").)[3] Plaintiff was to complete "Phase 1" of three phases of the Project. (PJRSUMF ¶ 5.) The contract price for Plaintiff's work was $5,194,700. (Agreement 12.) The scope of Plaintiff's work on the Project is identified in two Riders to the Agreement. (*Id.* at 7, 9-16.)

Pursuant to the Agreement, Lisa Landers of Fabiano Designs was designated as the Initial Decision Maker. (PJRSUMF ¶¶ 8-10; Agreement at 2, 6, 27.) The Agreement defines a "claim" as a "demand or assertion by one of the parties seeking, as a matter of right, payment of money, or other relief with respect to the terms of the [Agreement]." (Agreement at 54.) All claims were referred to the Initial Decision Maker for an initial decision and the Initial Decision Maker was

---

Response ("PJRResp"), ECF No. 20-2; Defs.' Response, ECF No. 21-1 ("DResp").) While the parties generally agree on the facts, the Court notes, as necessary, where the parties disagree.

[2] The Policy consists of five individual year-long policies issued by Defendants and effective from August 18, 2011 through August 18, 2016. (DSUMF ¶ 42; Exs. 17-21, ECF Nos. 17-20 to 17-24.) National Fire issued three policies covering August 18, 2011 through August 18, 2014. (DSUMF ¶ 42.) Valley Forge issued two policies covering August 18, 2014 through August 12, 2016. (*Id.*) Because the relevant portions of the Policy are the same in each individual policy, the Court cites only to the policy in effect from August 18, 2011 to August 18, 2012. (Policy, Ex. 17, ECF No. 17-20.)

[3] Many of the exhibits submitted by Defendants do not contain internal pagination or the exhibit is a combination of multiple documents with nonconsecutive pagination. Thus, when citing to the defendants' exhibits, the Court uses the page numbers imprinted on the documents by the CM/ECF system. When citing to a deposition transcript, the Court uses the page numbers provided in the transcript.

required to take action within ten days of the claim. (*Id.* at 55.) The Initial Decision Maker could approve or deny a claim. (*Id.*)

Landers reviewed Plaintiff's applications for payment for work completed on the Project. (PJRSUMF ¶ 14.) Landers would go to the Project site and "assess where [PJR was] in terms of construction and approve or deny the [a]pplication for [p]ayment[,]" and she also would report to Rudy Fabiano, Principal of Fabiano Designs, whether the application for payment should be approved or denied. (Ex. D, Lisa Landers Dep. Tr. 17:15-18:5 ("Landers Dep."); ECF No. 20-4.) Landers did not provide the final sign-off on Plaintiff's applications for payments; this sign-off, or certification, was provided by Rudy Fabiano. (*Id.*; PJRSUMF ¶ 15.) When an application for payment was certified, it indicated that a representative of Fabiano Designs had observed the work on the project;[4] the work had been completed to the extent indicated in the application; "the quality of the workmanship and material performed to [the Agreement];" and that the "architect [knew of] . . . . no reason why payment[] should not be made." (Landers Dep. 20:7-25.)

Fabiano Designs provided construction administration services for the project from December 2012 to January 14, 2014, and on February 29, 2014, Fabiano Designs informed Plaintiff that it was no longer providing those services and could not approve applications for payment. (PJRSUMF ¶¶ 39-40.) Landers was involved in approving payment applications numbers 1 to 14, and Sinibaldo Fabiano was involved with and signed off on payment applications numbers 15 through 20. (*Id.* ¶¶ 20-23.) After Fabiano Designs informed PJR that it could no longer approve payment applications, Frank Ward, Principal of Cambridge, paid and approved payment application numbers 21 to 25. (*Id.* ¶¶ 27, 41.)

---

[4] Plaintiff avers that the certification indicates that the architect had "inspected" the work done on the Project. (PJRSUMF ¶ 16(a).) Landers, however, testified that "inspection" was a technical term and that the architect's "construction administration responsibilities [were] observations." (Landers Dep. 21:12-22:3.) The Court, accordingly, uses the term "observation."

3

Plaintiff began working on the Project on or about May 29, 2012. (DSUMF ¶ 3.) The Agreement contained a project completion date of March 1, 2013, but due to numerous Change Orders, the "substantial completion date" was extended 407 working days. (*Id.* ¶¶ 4-5.) Plaintiff was denied access to the Project's site on November 13, 2014. (*Id.* ¶ 7.) Defendants state that Cambridge estimated that the Project was between 55% and 74.3% complete when PJR stopped working on it. (*Id.* ¶ 8.) Plaintiff denies that Cambridge's estimates are correct and states that the Project was at least 77.9% complete. (PJRResp. ¶ 8.) Plaintiff's 77.9% completion is based on payment application number 26R2, which reflects a 77.9% completion rate. (PJRSUMF ¶ 32; Ex. G, Payment Application at 4 ("26R2") ECF No. 20-4.)

On November 25, 2014, counsel for Cambridge sent Plaintiff correspondence. (DSUMF ¶ 10; Ex. 4 ("Cambridge Termination"), ECF No. 17-7.) The correspondence indicated that the Agreement would be terminated by Cambridge on December 2, 2014 and the termination was pursuant to Sections 14.2.1.1; 14.2.1.2; and 14.2.1.4 of the Agreement. (Cambridge Termination.) On the same day, Plaintiff sent Cambridge correspondence indicating that the Agreement would be terminated pursuant to Sections 14.1.3 and 14.1.4 of the Agreement. (DSUMF ¶ 15; Ex. 5, ECF No. 17-8.)

Cambridge hired Sweetwater Construction Company ("Sweetwater") to complete the Project. (DSUMF ¶ 18.) The parties disagree about the work Sweetwater had to perform to complete the Project. Defendants rely upon the testimony of Kenneth Eipel, a consultant Cambridge retained; Brian Furka, a Sweetwater representative; and Cambridge's allegations in the PJR-Cambridge dispute to establish that certain work had to be completely redone and significant portions of the Project were left unfinished. (*Id.* ¶¶ 19, 21-24.) Plaintiff denies these statements and relies on payment application numbers 25 and 26R2 to argue that portions of the Project were

100% complete and other portions of the Project were over 90% complete when Plaintiff stopped working on the Project. (PJRResp. ¶¶ 19, 21-24 (referencing PJRSUMF ¶¶ 31-33).)

On February 18, 2015, Plaintiff filed suit against Cambridge and Ward in the Superior Court of New Jersey, Law Division, Monmouth County. (DSUMF ¶ 26; Ex. 11, Complaint, ECF No. 17-14.) On June 12, 2015, the Honorable Joseph P. Quinn, J.S.C., dismissed without prejudice Plaintiff's suit against Cambridge based upon a finding that Plaintiff's claims were subject to arbitration pursuant to the Agreement. (Ex. 12, Order & Statement of Reasons, ECF No. 17-15.)

Via correspondence dated February 4, 2016, pursuant to the Agreement, Cambridge sent Plaintiff's counsel a demand for arbitration. (*See* Ex. 10 at 2 ("Arbitration Demand"), Correspondence, ECF No. 17-13.) Cambridge's claim was for $4,078,664.87 plus attorneys' fees and costs. (*Id.* at 2.) Cambridge's demand identified nine examples of deficient performance:

1. PJR repeatedly failed to supply enough properly skilled workers and proper materials which led to slow progress on the job;
2. PJR failed to properly supervise subcontractors;
3. PJR tolerated shoddy workmanship on the job;
4. PJR failed to provide construction schedules;
5. PJR failed to supply sufficient substantiating data for Change Orders or to follow agreed upon percentage fee for Change Orders;
6. PJR failed to supply information substantiating that subcontractors were paid properly;
7. PJR repeatedly disregarded applicable law, particularly the requirements of OSHA to provide a safe job site;
8. PJR breached the terms of contract documents and project plans and specifications. The most egregious example of this is the lack of flashing throughout the entire Cambridge Club building; and
9. There were also instances of unqualified subcontractors on the jobsite and the project superintendent hired by PJR was incompetent.

(Arbitration Demand 5.) Cambridge also identified ten construction defects which required correction:

1. Lack of proper sealant;
2. Lack of proper flashing and/or improperly installed flashing;

5

3. Failure to follow manufacturers' installation instructions;
4. Gaps in gaskets;
5. Water resistant barrier installation issues, including but not limited to, failure to take proper steps to stop water infiltration;
6. Lack of weather protection at jams;
7. Inappropriate construction coordination and sequencing which includes, but is not limited to, the failure to achieve a proper building seal compromising weather tightness;
8. Incorrect application of masonry;
9. Incorrect application of storefront and curtain wall glass systems; and
10. Incorrect installation of all handicap ramps.

(*Id.* at 6.) Cambridge stated that a number of contractors and consultants had observed and inspected the Project and corroborated Cambridge's claims while identifying specific issues with the work PJR performed. (*Id.* at 6-8.) Also included in the Arbitration Demand was a compilation of Cambridge's asserted damages. (*Id.* at 9-11.)

On February 10, 2016, Plaintiff sent Cambridge's counsel an Answer to the Arbitration Demand, Counterclaim, and a Claim against Ward. (DSUMF ¶ 35; Ex 14 ("PJR Answer"), ECF No. 17-17.) Via Counterclaim, Plaintiff sought $818,020.92, lost profits, costs, attorneys' fees, and expert fees. (PJR Answer 9.)

On April 1, 2016, Plaintiff sent correspondence seeking insurance defense and indemnity under the Policy for the PJR-Cambridge Dispute from Defendants. (DSUMF ¶ 37; Ex. 15, ECF No. 17-18.) In correspondence dated May 9, 2016, Defendants denied Plaintiff coverage for the PJR-Cambridge Dispute because (1) "exclusion[s j(5)[5] and j(6)[6]] will apply to bar coverage for

---

[5] Exclusion j(5) provides that the Policy does not apply to "'Property Damage' to: . . . [t]hat particular part of real property on which your or any contractors or subcontractors working directly or indirectly on your behalf are performing operation, if the 'property damage' arises out of those operations . . . ." (Policy 16.) The Court refers to this exclusion as the "Ongoing Operations Exclusion."

[6] Exclusion j(6) provides that the Policy does not apply to "'Property Damage' to: . . . . [t]hat particular part of any property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it." (*Id.*) The Court refers to this exclusion as the "Business Risks Exclusion."

6

this claim . . . and [(2)] the subcontractor exception to the 'your work' exclusion does not apply as that only applies to a completed operations claim." (DSUMF ¶ 38; Correspondence 2, Ex. 16 ("Denial Letter 2"), ECF No. 17-19.)) Defendants further explained:

> Based on the definition of the "products completed-operations hazard" . . . , this claim does not qualify as being "completed" as all the work called for in the contract had not been completed nor ha[s] the project been put to its intended use. As this would be considered an ongoing operations claim, exclusion J5 & 6 will apply to bar coverage.

(Denial Letter 3.)

On May 18, 2017, Plaintiff initiated the instant matter by filing a complaint in New Jersey Superior Court, Law Division, Monmouth County. (*See* Compl.) On June 11, 2018, Cambridge sent PJR a list of fifteen different categories of consequential damages it was asserting in the arbitration between PJR and Cambridge. (*Compare* DSUMF ¶33, *with* Ex. 13 ("Consequential Damages Correspondence"), ECF No. 17-16.) On December 21, 2018, Defendants filed the instant Motion for Summary Judgment. (Mot. for Summ. J., ECF No. 17.) On January 17, 2019, Plaintiff opposed (Pl.'s Opp'n Br., ECF No. 20), and on January 25, 2019, Defendants replied (Defs.' Reply Br., ECF No. 21).

## II.     LEGAL STANDARD

Summary judgment is appropriate if the record demonstrates "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A material fact—a fact "that might affect the outcome of the suit under the governing law[,]" *Anderson*, 477 U.S. at 248—raises a "genuine" dispute if "a reasonable jury could return a verdict for the nonmoving party." *Williams v. Borough of W. Chester*, 891 F.2d 458, 459 (3d Cir. 1989) (quoting *Anderson*, 477 U.S. at 248). To determine whether a genuine dispute of material fact exists, the Court must consider all facts and reasonable inferences in the light most favorable to the non-movant. *Curley*

*v. Klem*, 298 F.3d 271, 276-77 (3d Cir. 2002). The Court will not "weigh the evidence and determine the truth of the matter" but will determine whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249.

Although the moving party bears the initial burden of showing the absence of a genuine dispute of material fact, meeting this obligation shifts the burden to the non-moving party to "set forth specific facts showing that there is a genuine [dispute] for trial." *Anderson*, 477 U.S. at 250 (internal quotation marks omitted). The Court must grant summary judgment if the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists. *Big Apple BMW, Inc. v. BMW of N. Am. Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992). Furthermore, "a party does not raise a genuine [dispute] of material fact by speculation and conclusory allegations." *Dunkin' Donuts Inc. v. Patel*, 174 F. Supp. 2d 202, 209 (D.N.J. 2001).

### III.     DISCUSSION

As a threshold matter, the Court notes the *Erie* Doctrine requires that in a matter where a federal court sits in diversity, like the instant matter, state substantive law applies. *Gasperini v. Ctr. of Humans., Inc.*, 518 U.S. 415, 427 (1996); (Not. of Removal ¶ 12, ECF No. 1 (asserting that the Court has jurisdiction pursuant to 28 U.S.C. 1332(a)(1)).) Here, New Jersey law applies and the Court must apply New Jersey law as articulated by the New Jersey Supreme Court and the holdings of New Jersey's "intermediate appellate state court . . . [are datums] for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Edwards v. HOVENSA, LLC*, 497 F.3d 355, 361 (3d Cir. 2007) (quoting *West v. A.T. & T. Co.*, 311 U.S. 223, 237 (1940)).

New Jersey courts have "long recognized [that insurance policies] must be analyzed under the rules of simple contract law, and require [the Court] to read the document as a whole in a fair and common sense manner . . . ." *Cypress Point Condo. Ass'n, Inc. v. Adria Towers, L.L.C.*

("*Cypress Point II*"), 143 A.3d 273, 280 (N.J. 2016) (internal citations and quotation marks omitted). When analyzing contract language, the "plain, ordinary meaning" of the terms control. *Zacarias v. Allstate Ins. Co.*, 775 A.2d 1262, 1264 (N.J. 2001). "In attempting to discern the meaning of a provision in an insurance contract, the plain language is ordinarily the most direct route." *Chubb Custom Ins. Co. v. Prudential Ins. Co. of Am.*, 948 A.2d 1285, 1289 (N.J. 2008) (citation omitted). "Courts enforce contracts 'based on the intent of the parties, the express terms of the contract, surrounding circumstances and the underlying purpose of the contract.'" *Manahawkin Convalescent v. O'Neill*, 85 A.3d 947, 958 (N.J. 2014) (citations omitted). "[W]hen 'the language of a contract is plain and capable of legal construction,'" however, "the language alone must determine the agreement's force and effect." *Cypress Point II*, 143 A.3d at 280 (quoting *Manahawkin*, 85 A.3d at 958-59) (internal quote marks omitted). Accordingly, "[w]hen the terms of an insurance contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties." *Id.* (quoting *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (1960); *Flomerfelt v. Cardiello*, 997 A.2d 991, 996 (N.J. 2010).

An insurance policy may be ambiguous when the "phrasing of the policy is so confusing that the average policyholder cannot make out the boundaries of coverage." *Lee v. Gen. Accident Ins. Co.*, 767 A.2d 985, 987 (N.J. Super. Ct. App. Div. 2001) (citation omitted). "When the provision at issue is subject to more than one reasonable interpretation, it is ambiguous, and the 'court may look to extrinsic evidence as an aid to interpretation.'" *Templo Fuente de Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 129 A.3d 1069, 1075 (N.J. 2016) (quoting *Chubb Custom*, 948 A.2d at 1289).

"As to insurance contracts specifically, 'the general rule of construction [is] that if the controlling language of a policy will support two meanings, one favorable to the insurer and the other to the insured, the interpretation favoring coverage should be applied.'" *Cypress Point II*,

9

143 A.3d at 280 (alteration in original) (quoting *Butler v. Bonner & Barnewell, Inc.*, 267 A.2d 527, 532 (N.J. 1970)). "Moreover, '[w]hile specific words may not be ambiguous, the context in which they are used may create an ambiguity. The court's responsibility is to give effect to the whole policy, not just one part of it.'" *Id.* at 280. (citation omitted). Courts, where tasked with interpreting what an insurance policy encompasses, turn to the definitions within that policy. *See Evora v. Reciprocal Mgmt. Corp.*, No. 4287-03, 2005 WL 3310013, at *2 (N.J. Super. Ct. App. Div. Dec. 8, 2005) (examining the definitions within an insurance policy to determine liability).

"When an insurance carrier puts in issue its coverage of a loss under a contract of insurance by relying on an exclusionary clause, it bears a substantial burden of demonstrating that the loss falls outside the scope of coverage." *United Rental Equip. Co. v. Aetna Life & Cas. Inc.*, 376 A.2d 1183, 1187 (N.J. 1977). In addition to the general insurance contract principles set forth above, courts must be mindful when considering policy exclusions that:

> [E]ach exclusion is meant to be read with the insuring agreement, independently of every other exclusion. The exclusions should be read seriatim, not cumulatively. If any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions. There is no instance in which an exclusion can properly be regarded as inconsistent with another exclusion, since they bear no relationship with one another.

*Weedo v. Stone-E-Brick, Inc.*, 405 A.2d 788, 795 (N.J. 1979). Thus, courts construe exclusionary clauses strictly against the insurer, understanding "that the insured is entitled to protection to the full extent that any reasonable interpretation of them will permit." *Sealed Air Corp. v. Royal Indem. Co.*, 961 A.2d 1195, 1204 (N.J. Super. Ct. App. Div.) (citation omitted), *certif. denied*, 960 A.2d 396 (N.J. 2008).

Courts usually employee a three-step analysis to resolve disputes like the instant one. *See Cypress Point II*, 143 A.3d 285-86. First, the Court must examine the facts of the insured's claims

"to ascertain whether the polic[y] provide[s] an initial grant of coverage." *Id.* If the policy grants coverage, the Court must "consider[] whether any of the polic[y's] exclusions preclude coverage." *Id.* at 286. If an exclusion applies, the Court must "determine whether an exception to a pertinent exclusion applies to restore coverage." *Id.*

As explained below, the Court concludes that if the Policy does provide coverage for the PJR-Cambridge Dispute, the Ongoing Operations Exclusion precludes coverage. The Court, therefore, bypasses the first step and addresses Defendants' primary argument. Thus, in the analysis below, the Court assumes that the Policy provides an initial grant of coverage.

### A. The Ongoing Operations Exclusion

Defendants argue that two exclusions bar coverage for Plaintiff for the PJR-Cambridge Dispute. (*See* Defs.' Moving Br. 14-16, ECF No. 17-1.) Specifically, Defendants assert that the Ongoing Operations Exclusion bars coverage because "when PJR was terminated from the Project in November 2014, it was still in the process of performing work at the Project and that Cambridge's alleged damages occurred while PJR's work operations were ongoing." (*Id.* at 15.) Defendants insist that the Business Risk Exclusion bars coverage because "the sole basis for . . . Cambridge's claim against PJR is that PJR's work needed to be 'restored, repaired, or replaced', since it 'was incorrectly performed.'" (*Id.* at 15.) Citing to *Weedo*, and *Atlantic Mutual Insurance Co. v. Hillside Bottling Co.*, 903 A.2d 513 (N.J. Super. Ct. App. Div. 2006), Defendants aver that general liability policies, like the one at issue here, are not performance bonds and do not provide coverage for customers who are unsatisfied with the policy holders' work. (*See id.* at 15-16.)

Plaintiff opposes, arguing that coverage for the PJR-Cambridge Dispute is required under the Policy and there are disputed issues of fact and law precluding the Court from granting Defendants' motion. (Pl.'s Opp'n Br. 1, ECF No. 20-1.) Plaintiff insist that Defendants have

taken the position that the New Jersey Superior Court, Appellate Division (the "Appellate Division"), and New Jersey Supreme Court, respectively, rejected in *Cypress Point Condominium Association, Inc. v. Adria Towers, LLC* ("*Cypress Point I*"), 118 A.3d 1080, 1082 (N.J. Super. Ct. App. Div. 2015), and *Cypress Point II*. Plaintiff states that in *Cypress Point II*, the New Jersey Supreme Court held that (1) the claims against the insured constituted both an "occurrence" and "property damage" under the terms of the policy and (2) the claims were covered under the policy because they "arose out of faulty workmanship performed by sub-contractors . . . ." (*Id.* at 9-14.) Plaintiff criticizes Defendants' reliance on *Weedo* as inapposite because *Weedo* interprets the terms of a 1973 policy as opposed to the 1986 policy interpreted in *Cypress Point I* and *II*, and present in the instant matter. (*Id.* at 14.) Plaintiff asserts that while Defendants repeatedly highlight that the Project was not complete, "the amount of completion does not matter because" the Ongoing Operations Exclusion and Business Risk Exclusion do not apply because of the Subcontractor Exception.[7] (*Id.* at 15.)

In *Ohio Casualty Insurance Co. v. Island Pool & Spa, Inc.*, the Appellate Division considered an exclusion verbatim to the Ongoing Operations Exclusion in the Policy. 12 A.3d 719, 725 (N.J. Super. Ct. App. Div. 2011). The defendant in *Ohio Casualty* was hired to repaint a residential swimming pool. *Id.* at 721. To paint the pool, the defendant drained the pool and installed a pump to prevent water under the pool from applying pressure to the underside of the pool. *Id.* The pump failed during a rainstorm, and the pool was forced out of the ground and cracked. *Id.* The defendant replaced the pool and provided new decking and landscaping. *Id.*

---

[7] The Policy includes an exclusion providing that the Policy does not apply to "'Property Damage' to 'your work' arising out of it and included in the 'products-completed operations hazard.'" (Policy 16.) The Subcontractor Exception is an exception to this exclusion and provides "[t]his exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." (*Id.*)

12

The defendant submitted the expenses for (1) the replacement of the pool, (2) the new decking, and (3) the landscaping to its insurer as a claim under its policy. *Id.* Citing to the j(5) and j(6) exclusions in the applicable policy, the insurer denied coverage for the claim as related to the replacement of the pool and granted coverage for the portion of the claim related to the new decking and landscaping. *Id.* The insurer brought suit seeking to collect unpaid insurance premiums, and the defendant asserted a counterclaim for coverage under the policy for the portion of the claim related to the pool. *Id.* at 720.

The insurer moved for summary judgment relying on the j(5) exclusion, which is the same language as the Ongoing Operations Exclusion, and the defendant cross-moved seeking a declaration that the insurer was required to provide coverage pursuant to the policy. *Id*. at 721-23. The New Jersey Superior Court, Law Division, granted the defendant's motion finding the insurer's position of granting coverage for the decking and landscaping was inconsistent with the denial of coverage for the pool replacement costs. *Id.* at 722. The Appellate Division disagreed and reversed the grant of defendant's motion. *Id.* at 728.

The Appellate Division found the damage to the pool occurred while the defendant was performing operations and the damage was a result of those operations. *Id.* at 725. The plaintiff, accordingly, was entitled to deny coverage pursuant to the j(5) exclusion. *Id.* at 728. The Appellate Division observed that "no New Jersey court has had occasion to interpret" the j(5) exclusion. *Id.* at 725. After considering the views of other jurisdictions, the Appellate Division held that the j(5) exclusion applies when: (1) the "claim [is] for damage to 'real property'", (2) "the insured, or someone working on behalf of the insured, [was] performing operations on 'that particular part' of the property that was damaged," and (3) "the damage occur[red] while the operations were being performed." *Id*. at 728.

Here, the Policy does not define "real property." (*See* Policy 23-27.) The Court, accordingly, must look to the ordinary meaning of the term. *See President v. Jenkins*, 853 A.2d 247, 256 (N.J. 2004) (relying on the ordinary meaning of the term "retroactive date" because the insurance policy did not define the term). Black's Law Dictionary defines "real property" as "[l]and and anything growing on, attached to, or erected on it, excluding anything that may be severed without injury to the land." *Property*, Black's Law Dictionary (11th ed. 2019). Black's Law Dictionary further explains that "[r]eal property can be either corporeal (soil and buildings) or incorporeal (easements)." *Id.* In this matter, the damages Cambridge complains of are damages to the structure PJR was contracted to build. (*See generally* Arbitration Demand; Consequential Damages Correspondence.) Because the definition of real property includes anything erected upon the land, the Court concludes that the claims PJR seeks coverage for are damages to real property.

In *Ohio Casualty*, the Appellate Division distinguished between the "particular part" of the real property the defendant was working on, the pool, and other parts of the real property where the defendant was not performing operations, the decking and the landscaping. *Ohio Cas.*, 12 A.3d at 728. The Appellate Division's analysis was aided by the fact that the defendant was hired to repaint the pool and the defendant's work did not involve the decking or the landscaping. *Id.* at 721.

Here, the Court's analysis is more nuanced because Phase 1 of the Project appears to be divisible into subparts, some of which were completed and others which were not. Indeed, Plaintiff contends, and Defendants admit, that applications for payment 25 and 26R2 show that "most of the major items in the building were 100% completed including the concrete masonry, the steel structure and windows with the aluminum and glass . . . and almost all of the [C]hange [O]rders [were] 100% complete." (PJRSUMF ¶ 33.) As one commentator has explained, "[t]he phrase 'that part of real property' is not defined in [policies like the Policy in the instant matter] and has

been subject to differing interpretations by courts faced with the issue." Martha A. Kersey, *New Appleman on Insurance Law Library Edition*, § 18.03(2)(h)(iv); *see also Ohio Cas.*, 12 A.3d at 727-28 (discussing New Appleman on Insurance Law.). "In making that determination, courts consider: (1) the scope of the insured's work; (2) where the insured was actually working when the damage occurred; and (3) what the insured was doing in relation to the property." *Id.*

Here, the Court concludes that the operative definition of "that particular part of the real property" is the Project as a whole. PJR was hired to construct a "26,250 square foot clubhouse building and 3,150 square foot pavilion building," and the scope of Plaintiff's work was outlined in the Agreement and the attachments thereto. Although Plaintiff may have completed some portions of the Project, the fact remains that other portions of the Project were incomplete at time the subject damage to Cambridge occurred. Simply put, PJR was hired to construct a building and at the time the damage occurred, Plaintiff was still attempting to complete that building. Cambridge does not complain of damage to other parts of the worksite that PJR was not responsible for. Rather, Cambridge complains of the work PJR did on the Project and damage resulting from PJR's work. The Court, accordingly, finds PJR was still performing work on that particular part of the property that was damaged.

The Court's finding accords with the Appellate Division's conclusions in *New Jersey-American Water Co. v. Watchung Square Associates, LLC*, No. 3436-13T1, 2016 WL 3766248 (N.J. Super. Ct. App. Div. July 15, 2016). In *Watchung Square*, a contractor was hired to excavate an entire worksite for a shopping center and, in a separate contract, hired to relocate a water main on the same worksite. *Watchung Square*, 2016 WL 3766248, at *9. Throughout the project there were multiple slope failures, one of which impacted the contractor's work related to the water main relocation. *Id.* at *1. Before the Appellate Division, the contractor argued the Superior Court judge erred by finding that an exclusion like the Ongoing Operations Exclusion

applied because the worksite should not "be viewed as one undifferentiated worksite at which [the contractor] was working, rather than as discrete contracts and discrete properties and areas." *Id.* at \*9. The contractor also argued that it "was not sued for damage to the same property it was working on . . . ." *Id.*

The Appellate Division rejected the contractor's arguments. *Id.* at \*10. The Appellate Division noted that the contractor did not deny the Superior Court's statement that the contractor "was doing all of the excavation work on this particular property . . . ." *Id.* The Appellate Division reasoned that the applicable insurance policy was not limited to work related to the water main, instead the policy insured the contractor "for all of its work." *Id.*

In the instant matter, PJR was the only contractor hired by Cambridge to complete Phase 1 of the Project, except for Sweetwater when PJR was no longer working on the Project. Moreover, as in *Watchung Square*, the insurance policy at issue covers all of PJR's work, not a specific subpart of Phase 1 of the Project.

The Court finds the damages occurred while operations were being performed. Plaintiff admits it was still working on the Project as of November 2014 when it was denied access to the site. (DSUMF ¶ 6-7; PJRResp. ¶¶6-7.) Plaintiff also admits the damages Cambridge complains of are damages that occurred while Plaintiff was working on the Project. (DSUMF. ¶¶ 28, 32-34; PJRResp. ¶¶ 28, 32-34.) The Court, accordingly, concludes the damages Plaintiff seeks coverage for occurred while operations were being performed.

In *Ohio Casualty*, the Appellate Division held that Ongoing Operations Exclusion applied so long as three elements were fulfilled. *Ohio Cas.*, 12 A.3d at 728. For the reasons set forth above, the Court finds that each element is fulfilled. The Court, therefore, finds that the Ongoing Operations Exclusion precludes coverage.

### B. The Your Work Exclusion Does Not Provide a Grant of Coverage

In *Cypress Point II*, the New Jersey Supreme Court stated that *Weedo* is often cited as the leading case on whether commercial general liability ("CGL") policies cover construction defects. *Cypress Point II*, 143 A.3d at 282. The *Cypress Point II* court then acknowledged that "[t]he policy at issue in *Weedo* was the 1973 version of the standard form CGL," while the policy before the *Cypress Point II* court was "the 1986 ISO standard form CGL policy," and that the New Jersey Supreme Court had "never addressed questions of coverage for consequential damages caused by faulty workmanship under" the later version of the policy. *Id*. at 282-83. Turning to the policy at issue, the *Cypress Point II* court held that "because the result of the subcontractors' faulty workmanship . . .—consequential water damage to the completed and nondefective portions of [the building]—was an 'accident,' it [was] an 'occurrence' under the policies . . . .". *Id*. Thus, barring the application of an exclusion, the insurer was obligated to provide coverage. *Id.* After analyzing the exclusions in the policy, the *Cypress Point II* court held that the subcontractor exception to the exclusion "unquestionably applie[d]" and because the damage to the completed portions of the building were "alleged to have arisen out of faulty workmanship performed by subcontractors," the insurer was obligated to provide coverage. *Id.* at 289-90.

Here, Plaintiff argues the Ongoing Operations Exclusion does not apply because of the exception for work performed by subcontractors as discussed in *Cypress Point II*.[8] (Pl.'s Opp'n Br. 15.) Plaintiff's position relies on an overbroad reading of *Cypress Point II*. At issue in *Cypress*

---

[8] Exclusion l provides that the Policy does not apply to "'Property Damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" (Policy 16.) The Court refers to this as the "Your Work Exclusion." The Your Work Exclusion also provides, "This exclusion does not apply if the damaged work or the work out of which the damage arises was performed on your behalf by a subcontractor." This Court refers to this provision as the "Subcontractor Exception." The policy at issue in *Cypress Point II* contained a similar exclusion and exception as the instant Your Work Exclusion and Subcontractor Exception. *See Cypress Point II*, 143 A.3d at 289.

*Point II* was language similar to the Your Work Exclusion and the Subcontractor Exception. The *Cypress Point II* court, however, did not consider the Ongoing Operations Exclusion Defendant relies on here. Moreover, the Ongoing Operations Exclusion does not include a subcontractor exception like the Your Work Exclusion. (*See* Policy 16.) Applying the Subcontractor Exception in the Your Work Exclusion to the Ongoing Operations Exclusion would defy the *Weedo* court's guidance that "exclusions should be read seriatim, not cumulatively[,]" and "[i]f any one exclusion applies there should be no coverage, regardless of inferences that might be argued on the basis of exceptions or qualifications contained in other exclusions." *Weedo*, 405 A.2d at 795; *accord Wenzel v. Nautilus Ins. Co.*, 474 F. App'x 862, 864 (3d Cir. 2012) ("[I]n New Jersey, a limitation to one exclusion of an insurance policy cannot restrict the scope of an entirely different exclusion."). The Court, accordingly, concludes that the Subcontractor Exception does not apply to the Ongoing Operations Exclusion.

## IV. CONCLUSION

In sum, the Court finds that the Ongoing Operations Exclusion precludes coverage for the PJR-Cambridge Dispute, assuming that the PJR-Cambridge dispute would be covered under the Policy. The Court also finds the Subcontractor Exception to the Your Work Exclusion does not apply to the Ongoing Operations Exclusion. The Court, accordingly, grants Defendants' Motion for Summary Judgment. An order consistent with this Memorandum Opinion will be entered.

s/ Michael A. Shipp  
**MICHAEL A. SHIPP**  
**UNITED STATES DISTRICT JUDGE**
